# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| GERALD BILGER, Individually and On Behalf of All Others Similarly Situated, ) ) ) | |
| ) **CIVIL ACTION NO. 07-cv-03815** | |
| Plaintiff, ) ) | |
| vs. ) ) | |
| ) CLASS ACTION COMPLAINT ) | |
| ALLOT COMMUNICATIONS LTD., YIGAL JACOBY, RAMI HADAR and ADI SAPIR, ) ) ) **JURY TRIAL DEMANDED** | |
| ) ) | |
| Defendants. ) ) ) | |

Plaintiff, Gerald Bilger ("Plaintiff"), alleges the following based upon the investigation by Plaintiff's counsel, which included, among other things, a review of the defendants' public documents, conference calls and announcements made by defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Allot Communications Ltd. ("Allot" or the "Company"), securities analysts' reports and advisories about the Company, and information readily available on the Internet, and Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION AND OVERVIEW

1.    This is a federal class action on behalf of purchasers of the common stock of Allot, who purchased or otherwise acquired Allot's common stock pursuant or traceable to the Company's November 15, 2006 Initial Public Offering (the "IPO" or the "Offering") through

April 2, 2007, seeking to pursue remedies under the Securities Act of 1933 (the "Securities Act").

2.    Allot is a designer and developer of broadband service optimization solutions using advanced deep packet inspection technology.  The Company provides solutions to broadband service providers and enterprises with real-time network traffic, and enables them to manage and optimize their networks.  The Company's carrier-class products are used by service providers to offer subscriber-based and application-based tiered services that enable them to optimize their service offerings, reduce churn rates and increase average revenue per user.

3.    On November 15, 2006, the Company conducted its IPO.  In connection with the IPO, the Company filed a Registration Statement and Prospectus (collectively referred to as the "Registration Statement") with the SEC.  The IPO was a financial success for the Company, as it was able to raise $78 million by selling 6.5 million shares of stock to the investing public at a price of $12.00 per share.

4.    The Complaint alleges that, in connection with the Company's IPO, defendants failed to disclose or indicate: (1) that the Company was experiencing declining sales; and (2) that the sales declines were occurring in its indirect distribution channels.

5.    On April 2, 2007, the Company finally disclosed to investors for the first time that its revenues and earnings for the first quarter of 2007 and fiscal year 2007 were going to be dramatically lower than earlier forecasted, a guidance that was given to investors less than seven weeks before.  On the release of this news, shares of the Company's stock declined $2.04 per share, or 22.3 percent, to close on April 2, 2007 at $7.11 per share, on unusually heavy trading volume.  The closing price on April 2, 2007 represented a cumulative loss of $6.70 per share, or over 48.5 percent of the value of the Company's shares immediately following its IPO just

months prior.

6.      As a result of defendants' wrongful acts and omissions, and the precipitous decline in the market value of Allot's common stock, Plaintiff and other Class Members have suffered significant losses and damages.

## JURISDICTION AND VENUE

7.      The claims asserted herein arise under and pursuant to Sections 11 and 15 of the Securities Act (15 U.S.C. §§ 77k and 77o).

8.      This Court has jurisdiction over the subject matter of this action pursuant to Section 22 of the Securities Act (15 U.S.C. § 77v).

9.      Venue is proper in this Judicial District pursuant to Section 22 of the Securities Act.  Many of the acts and transactions alleged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this Judicial District.  Additionally, the IPO was actively marketed in this Judicial District.

10.     In connection with the acts, conduct and other wrongs alleged in this Complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

11.     Plaintiff, Gerald Bilger, as set forth in the accompanying certification, incorporated by reference herein, purchased Allot common stock at artificially inflated prices during the Class Period and has been damaged thereby.

12.     Defendant Allot is a designer, developer, marketer, and seller of broadband service optimization solutions. The Company's solutions provide broadband service providers

and enterprises with real-time visibility into, and control of, network traffic. The Company's headquarters are located at 22 Hanagar Street, Neve Neeman Industrial Zone B, Hod-Hasharon, Israel 45240.

13.    Defendant Yigal Jacoby ("Jacoby") was, at all relevant times, the Company's Chairman of the Board of Directors.

14.    Defendant Rami Hadar ("Hadar") was, at all relevant times, the Company's President, Chief Executive Officer ("CEO"), and a member of the Board of Directors.

15.    Defendant Adi Sapir ("Sapir") was, at all relevant times, the Company's Chief Financial Officer ("CFO") and Principal Accounting Officer.

16.    Defendants Jacoby, Hadar, and Sapir are collectively referred to hereinafter as the "Individual Defendants."  The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Allot's quarterly reports, press releases, documents, and presentations to securities analysts, money and portfolio managers and institutional investors, i.e., the market.  Each defendant was provided with copies of the Company's reports, press releases, and documents alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to material non-public information available to them, each of these defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and misleading.  The Individual Defendants are liable for the false statements pleaded herein, as those statements were each "group-published" information, the result of the collective actions of the Individual Defendants.

## SUBSTANTIVE ALLEGATIONS

### Background

17.     Allot is a designer and developer of broadband service optimization solutions using advanced deep packet inspection technology.  The Company provides solutions to broadband service providers and enterprises with real-time network traffic, and enables them to manage and optimize their networks.  The Company's carrier-class products are used by service providers to offer subscriber-based and application-based tiered services that enable them to optimize their service offerings, reduce churn rates and increase average revenue per user.

### Materially False and Misleading
### Statements Made in the Registration Statement

18.     On November 15, 2006, the Company conducted its IPO.  In connection with the IPO, the Company filed a Registration Statement and Prospectus (collectively referred to as the "Registration Statement") with the SEC.  The IPO was a financial success for the Company, as it was able to raise $78 million by selling 6.5 million shares of stock to the investing public at a price of $12.00 per share.

19.     With respect to an overview of the Company, the Registration Statement, in relevant part, stated:

> We are a leading designer and developer of broadband service
> optimization solutions using advanced deep packet inspection, or
> DPI, technology.  Our solutions provide broadband service
> providers and enterprises with real-time, highly granular visibility
> into, and control of, network traffic, and enable them to efficiently
> and effectively manage and optimize their networks. Our carrier-
> class products are used by service providers to offer subscriber-
> based and application-based tiered services that enable them to
> optimize their service offerings, reduce churn rates and increase
> average revenue per user, or ARPU. The rapid growth of
> broadband networks, such as cable, DSL and wireless, and the
> proliferation in the number and complexity of broadband
> applications have led broadband service providers to demand new

ways to manage their networks. Costly infrastructure upgrades to increase network bandwidth capacity neither address service providers' need for network visibility nor prioritize revenue-generating applications. Furthermore, service providers have generally been unsuccessful in capturing the significant new revenue opportunities available from providing differentiated, premium broadband services that command higher prices. By capitalizing on new revenue opportunities and maximizing the capacity of existing network infrastructure, our DPI technology enables service providers to optimize returns on their investments and enhance the quality of the services they provide.

Our products consist of our NetEnforcer traffic management systems and NetXplorer application management suite. NetEnforcer employs advanced DPI technology, which identifies applications at high speeds by examining data packets and searching for application patterns and behaviors. NetXplorer enables the implementation of user-defined network management policies and the collection of detailed statistics on the network's users and applications. Our goal is to be the leading provider of independent network inspection and management solutions used by service providers and enterprises to transform generic access broadband networks into intelligent broadband networks.

20.    With regard to the Company's competitive strengths, the Registration Statement,

in relevant part, stated:

**Our competitive strengths include the following:**

- **Market-leading DPI technology and analytical capabilities.** Our focus on developing the most efficient means to search for hundreds of different applications, combined with our extensive database of algorithms that detect network applications, provide us with a significant competitive advantage. We believe that our NetEnforcer AC-2500, is currently the only commercially deployed solution with its level of functionality capable of supporting 5 gigabits/second performance and 2 million simultaneous connections.

- **Broad product portfolio.** We believe that our broad product portfolio with offerings targeted at small, midsize and large service providers and enterprises enables us to compete in, and our channel partners to serve, a wider range of profitable markets than our competitors.

- **Independence from underlying network infrastructure.** Our independent solutions are designed for easy deployment and to be less disruptive to existing networks than embedded solutions, which require changes or upgrades to the network infrastructure. In addition, independent solutions can be upgraded easily to respond to rapid changes in application behavior and subscriber demands, and offer end-customers flexibility in choosing any infrastructure equipment vendor.

- **Global sales and marketing channels.** Our global network of over 300 distributors, resellers and systems integrators, through which we make substantially all of our sales, have enabled us to achieve a diverse customer base. We also rely on these third parties to install and provide basic technical support for our systems. To date, we have deployed over 9,000 NetEnforcer systems in 118 countries.

- **Focus on service optimization solutions.** We believe that our dedicated focus on DPI solutions differentiates the level of service and support that we provide to our channel partners and end-customers. This includes our responsiveness to the introduction of new applications and effective integration of our products into our customers' existing billing, customer care and other business systems. [Emphasis added.]

21.    With regard to the Company's sales and marketing network, the Registration Statement, in relevant part, stated:

**Channel Partners**

We market and sell our products to end-customers through our channel partners, which include distributors, resellers, OEMs and system integrators. Our channel partners generally purchase our products from us upon receiving orders from end-customers and are responsible for installing and providing initial customer support for our products. As of September 30, 2006, we had approximately 300 channel partners. Our channel partners are located around the world and address most major markets. Our channel partners target a range of end-users, including carriers, alternative carriers, cable operators, private networks, data centers and enterprises in a wide range of industries, including government, financial institutions and education. Our agreements with channel partners that are distributors or resellers are generally for an initial term of one year and automatically renew for successive one-year terms unless terminated. After the first year, such agreements may be

terminated by either party upon 90 days prior notice. These agreements are generally non-exclusive and generally contain minimum purchase requirements and we are permitted to terminate the agreement in the event of a failure to meet such targets.

We offer extensive support to all of our channel partners. This support includes the generation of leads through marketing events, seminars and web-based leads and incentive programs as well as technical and sales training.

Our sales staff's direct contact with end-customers consists mainly of developing leads for our channel partners. Substantially all of our sales occur through our channel partners.

22.    Further, with regard to how the Company planned to achieve its stated goal of becoming the leader in the industry, the Registration Statement, in relevant part, stated:

**Our Strategy**

Our goal is to be the leader in offering service providers and enterprises network inspection and management solutions to transform generic access broadband networks into intelligent broadband networks. Our strategy to achieve this goal includes the following:

- **Further our technological advantage.** We intend to continue investing in the development of our market leading broadband service optimization technologies. For example, our next generation solutions, which are designed to support multiple channels of 10 gigabits/second full performance throughput rates, will utilize the new Advanced Telecom Computing Architecture standards, or ATCA, since it better enables the integration of additional third-party services into our product offerings. We are also committed to developing new applications and services, such as subscriber management applications, voice and video quality analysis and additional security applications, in order to meet the evolving demands of our end-customers.

- **Continue to expand our sales and marketing channels.** We intend to expand our world-wide sales and marketing channels to further address small and medium-sized service providers and enterprises, including in the government and education sectors. Through these channels, we have sold our products to a diverse range of end-customers and we intend to build on this success by continuously improvingour channel

relationships, creating mutual marketing campaigns and supporting their efforts to promote our products. We intend to seek channel partners in new geographical territories, as well as in vertical markets in countries where we have already established a presence.

- **Focus on larger service providers.** We intend to target larger service providers, including carriers, and cable and mobile operators, in response to increased demand from them for the ability to differentiate their service offerings. We believe that targeting large service providers is important to our revenue growth because sales to these end-customers are more likely to result in sustained demand for our NetEnforcer systems as they deploy our products throughout their networks. We believe that we are well-positioned to continue to target these end-customers with our carrier-class products, together with our management solutions, operating experience and installed base. We intend to target these end-customers by continuing to develop partnerships with system integrators and OEMs in order to leverage their existing relationships with larger service providers. We intend to supplement these efforts with direct business development and by tailoring our customer support capabilities to further enhance our ability to support system integrators and OEMs.  [Emphasis added.]

23.    Additionally, with regard to the Company's revenue generation pattern, the Registration Statement, in relevant part, stated "our revenues are lowest in the first quarter and our fourth quarter has tended to exhibit stronger results than other quarters, which we believe may result from the budgeting processes of many of our customers which are based on a calendar fiscal year."

24.    The statements contained in ¶¶ 19 – 23 were materially false and misleading when made, because in connection with the Company's IPO, defendants failed to disclose or indicate: (1) that the Company was experiencing declining sales; and (2) that the sales declines were occurring in its indirect distribution channels.

25.    While the Registration Statement ostensibly warned that the Company's performance and growth was subject to certain risks, these warnings were insufficient and

inconsequential because the Company failed to disclose that, at the time of the IPO, the

Company was experiencing a recognizable sales decline in certain distribution channels.  The

Registration Statement, in relevant part, purported to warn:

### Factors Affecting Our Performance

Our business, financial position and results of operations, as well as the period-to-period comparability of our financial results, are significantly affected by a number of factors, some of which are beyond our control, including:

* * *

**Mix between product and service revenues.** … During the period from 2003 to 2005, we increased the percentage of our service revenues compared to product revenues both as a result of the increase in the installed base of our NetEnforcer and NetReality systems and also as a result of increased efforts to drive service contract renewals among end-customers. However, for the nine months ended September 30, 2006, the percentage of our service revenues was lower than in the nine months ended September 30, 2005, primarily as a result of product sales to a system integrator in the United Kingdom, as part of the deployment of our systems by NTL. In addition, such decrease in the percentage of our service revenues was also due in part to the decrease in sales of maintenance and support services relating to the NetReality products. We are targeting our service revenues to remain at approximately the percentage levels of 2004 and 2005. Our service gross margins have historically been slightly higher than our product gross margins and we believe that our service activities can be scaled to address a larger installed basis without a proportionate increase in cost of services.

**Size of end-customers and sales cycles.** We believe that our growth can be accelerated by increasing sales to large service providers and have hired additional sales and marketing personnel in recent years in order to achieve this goal. The deployment of our products by small and midsize enterprises and service providers can be completed relatively quickly with a limited number of NetEnforcer systems compared to the number required by large service providers. Design wins with large service providers, including carriers, are more likely to result in sustained demand for additional NetEnforcer systems as they deploy our products throughout their networks and as their networks grow. The increased deployment of our products in carriers' networks also

enhances our reputation and name recognition in the market. We, therefore, expect that significant customer wins in the carrier market will positively impact future performance. However, our performance is also influenced by sales cycles for our products, which typically fluctuate based upon the size and needs of end-customers that purchase our products. Generally, large service providers take longer to plan the integration of DPI solutions into their existing networks and to set goals for the implementation of the technology. The varying length of our sales cycles creates unpredictability regarding the timing of our sales and may cause our quarterly operating results to fluctuate if a significant customer defers an order from one quarter to another. Furthermore, longer sales cycles may result in delays from the time we increase our operating expenses and make investments in inventory, until the time that we generate revenue from related product sales.

**Average selling prices.** Our performance is affected by the selling price of our products. We price our products based on several factors, including manufacturing costs, the stage of the product's life cycle, competition, technical complexity of the product, discounts given to channel partners in certain territories, customization and other special considerations in connection with larger projects. We typically are able to charge the highest price for a product when it is first introduced to the market. We expect that the average selling prices for our products will decrease over the product's life cycle as our competitors introduce new products and DPI technology becomes more standardized. In order to maintain or increase our current price, we expect that we will need to enhance the functionality of our products by offering higher system speeds, and additional features, such as additional security functions, supporting additional applications and enhanced reporting tools. For example, we sell additional software packages as part of the NetXplorer management application suite, and optional upgrade application suites to the NetEnforcer network traffic management system. We also from time to time introduce higher end models that typically increase our average selling price. To further offset such declines, we sell maintenance and support programs on our products, and as our customer base and number of field installations grows our related service revenues are expected to increase.

**Cost of revenues and cost reductions.** We strive to control our cost of revenues in order to maintain and increase our gross margins. Our cost of revenues as a percentage of total revenues was 24.3% for 2003, 25.6% for 2004, 23.6% for 2005 and 22.0% for the nine months ended September 30, 2006. Our products use off-the-shelf components and typically the prices of such

11

components decline over time. In addition, we make an effort to identify cheaper components of comparable performance and quality, as well as making engineering improvements in our products that will reduce costs. Since our cost of revenues also include royalties paid to the Office of the Chief Scientist, our cost of sales may be impacted positively or negatively by actions of the Israeli government changing the royalty rate. In addition, we may in the future incorporate features into our products that require payment of royalties to third parties.

\* \* \*

**Risks Relating to Our Business**

\* \* \*

We depend on third parties to market, sell, install, and provide initial technical support for our products.

We market and sell our products to end−customers through third party channel partners, such as distributors, resellers, OEMs and system integrators. Our channel partners are also responsible for installing our products and providing initial customer support for them. As a result, we depend on the ability of our channel partners to market and sell our products successfully to end−customers. If any significant channel partners fail, individually or in the aggregate, to perform as we expect, our sales may suffer. We also depend on our ability to maintain our relationships with existing channel partners and develop relationships in key markets with new channel partners. We cannot assure you that our channel partners will market our products effectively, receive and fulfill customer orders of our products on a timely basis or continue to devote the resources necessary to provide us with effective sales, marketing and technical support. Our products are complex and it takes time for a new channel partner to gain experience in their operation and installation. Therefore, it may take a period of time before a new channel partner can successfully market, sell and support our products if an existing channel partner ceases to sell our products.

Our channel partners install our products and provide initial customer support to end−customers of our products. Any failure by our channel partners to provide adequate support to end−customers could result in customer dissatisfaction with us or our products, which could result in a loss of customers, harm our reputation and delay or limit market acceptance of our products.

Our agreements with channel partners are generally not exclusive and our channel partners may market and sell products that compete with our products. Our agreements with our distributors and resellers are usually for an initial one year term and following the expiration of this term, they can be terminated by either party. We can give no assurance that these agreements will not be terminated upon proper notice and any such termination may adversely affect our profitability and results of operations. [Emphasis added.]

26.    On February 13, 2007, the Company issued a press release entitled "Allot

Communications Announces Fourth Quarter and 2006 End of Year Results."    Therein, the

Company, in relevant part, stated:

**Full year revenues increase 49% over 2005**

Allot Communications Ltd. (NASDAQ:ALLT), a leader in IP service optimization solutions based on deep packet inspection (DPI) technology, today announced financial results for the fourth quarter and full year ended December 31, 2006.

Total revenues for the fourth quarter of 2006 reached $9.6 million, a 35% increase over the $7.1 million revenues reported in the fourth quarter of 2005. On a GAAP basis, net income for the fourth quarter of 2006 was $53 thousand, or $0.00 per diluted share, as compared with $341 thousand, or $0.08 per diluted share, in the fourth quarter of 2005. In 2006, revenues reached $34.1 million, representing a 49% increase over $23 million in revenues in 2005. On a GAAP basis, net income in 2006 totaled $616 thousand, or $0.04 per diluted share, as compared with a net loss of $2.4 million, or $0.81 per share, in 2005.

* * *

"Allot's strong growth in revenue and profitability during 2006 is a clear demonstration of our leadership position in the global deep packet inspection (DPI) market, enabling the intelligent optimization of today's IP broadband networks," stated Rami Hadar, Allot Communications President and Chief Executive Officer. "Our growth was driven by rising demand among service providers who are seeking high performance solutions to transform broadband pipes into intelligent networks, as well as continued demand from within the enterprise market. Allot's strong performance in 2006 is a testament to our ability to meet our customers' evolving needs for network optimization solutions with

the most technologically advanced DPI capabilities in the industry, and the hard work of our dedicated employees worldwide."

"The successful completion of our initial public offering during the fourth quarter of 2006 sets a solid foundation for the future, with a stronger balance sheet and increased brand awareness that we believe will allow us to continue to execute on our strategic global plan. We are continuing to expand our global channels and partners to address the enterprise and mid-tier service provider markets, as well as our direct touch activities with Tier-1 carriers. We continue to innovate and develop our product offerings. In 2006, we introduced our NetXplorer Management platform, our new Subscriber Management Platform and our high performance 5 GB/s NetEnforcer AC2500. We are in the advanced stages of the development of our next generation platform that will function as a DPI based service gateway enabling value added services by larger service providers. In its first version, it will support up to 20 GB/s throughput, providing support for 10G networks," concluded Hadar.

**Financial Guidance**

The company expects net revenues for the first quarter 2007, which is traditionally slow in our sector, to be similar to the level of the fourth quarter of 2006 revenues, with growth to resume in the second quarter of 2007 and continue through the remainder of the year. Earnings per diluted share for the first quarter of 2007 will be similar to the fourth quarter of 2006. For the year 2007, the company anticipates net revenues in the range of $43-47 million, with earnings per diluted share, excluding the effect of sharebased compensation, of between $0.27-0.33. [Emphasis added.]

27.    Then, on April 2, 2007, the Company issued a press release entitled "Allot Communications Updates Estimates for First Quarter 2007 and 2007 Fiscal Year." Therein, the Company, in relevant part, stated:

Allot Communications Ltd. (NASDAQ: ALLT), a leader in IP service optimization solutions based on deep packet inspection (DPI) technology, today announced that revenues and earnings for the first quarter of 2007 and the 2007 fiscal year are anticipated by the Company to be lower than its previous guidance.

Management reported that weakness in sales from some of the Company's distributors, principally in the Americas, which are focused on sales to enterprise, education, and smaller ISPs, had

resulted in lower than expected revenues. However, sales to larger customers, mainly Tier 2 service providers, which are conducted with the direct involvement of Allot's sales personnel, showed strong growth during the quarter.  As a result of this, management expects that revenues for the first quarter of 2007 will be in the range of $8.2 - 8.3 million, compared to the Company's original guidance of a level similar to the $9.6 million in revenues recorded during the fourth quarter of 2006.  As a result, Net income for the first quarter of 2007 will also decline.

"We were disappointed with the performance of some of our distributors during the quarter which may result in slower than expected growth throughout the year," said Rami Hadar, Allot's President and CEO.  "We are encouraged, however, by the progress we have made in larger accounts and the growth we saw in sales to these accounts during the quarter, both in terms of number of projects and sales.  Overall, we remain confident in our strategy and on the long-term outlook for our DPI products on a global basis."

**Financial Guidance**

As a result of the trends described above, the Company is updating its previous guidance for the year 2007, and currently anticipates that net revenues will total approximately $40 million.  Earnings guidance will also be lowered as a result, and will be discussed in detail upon issuance of the Company's full financial results for the first quarter of 2007.  [Emphasis added.]

28.    Upon the release of this news, shares of the Company's stock declined $2.04 per share, or 22.3 percent, to close on April 2, 2007 at $7.11 per share, on unusually heavy trading volume.  The closing price on April 2, 2007 represented a cumulative loss of $6.70 per share, or over 48.5 percent of the value of the Company's shares immediately following its IPO just months prior.

### PLAINTIFF'S CLASS ACTION ALLEGATIONS

29.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Allot common stock pursuant or traceable to the Company's November 2006

IPO through April 2, 2007, and who were damaged thereby (the "Class").  Excluded from the Class are defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

30.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Allot's common stock was actively traded on the NASDAQ.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Allot or its transfer agent, and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

31.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

32.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

33.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)    whether the federal securities laws were violated by defendants' acts as alleged herein;

(b)    whether statements made by defendants to the investing public during the

Class Period misrepresented material facts about the business, operations and management of Allot; and

(c)    to what extent the members of the Class have sustained damages and the proper measure of damages.

34.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## UNDISCLOSED ADVERSE FACTS

35.    The market for Allot's common stock was open, well-developed and efficient at all relevant times.  As a result of these materially false and misleading statements and failures to disclose, Allot's common stock traded at artificially inflated prices during the Class Period.  Plaintiff and other members of the Class purchased or otherwise acquired Allot's common stock relying upon the integrity of the market price of Allot's common stock and market information relating to Allot, and have been damaged thereby.

36.    During the Class Period, defendants materially misled the investing public, thereby inflating the price of Allot's common stock, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make defendants' statements, as set forth herein, not false and misleading.  Said statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company, its business and operations, as alleged herein.

17

37.    At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and other members of the Class.  As described herein, during the Class Period, defendants made or caused to be made a series of materially false or misleading statements about Allot's financial well-being, business prospects, and operations.  These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of Allot and its financial well-being, business prospects, and operations, thus causing the Company's common stock to be overvalued and artificially inflated at all relevant times.  Defendants' materially false and misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's common stock at artificially inflated prices, thus causing the damages complained of herein.

## LOSS CAUSATION

38.    Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiff and the Class.

39.    During the Class Period, Plaintiff and the Class purchased common stock of Allot at artificially inflated prices and were damaged thereby.  The price of Allot's common stock significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.

### Applicability of Presumption of Reliance:
### Fraud On The Market Doctrine

40.    At all relevant times, the market for Allot's common stock was an efficient market for the following reasons, among others:

(a)    Allot's stock met the requirements for listing, and was listed and actively

traded on the NASDAQ, a highly efficient and automated market;

(b)    As a regulated issuer, Allot filed periodic public reports with the SEC and the NASDAQ;

(c)    Allot regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)    Allot was followed by several securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

41.    As a result of the foregoing, the market for Allot's common stock promptly digested current information regarding Allot from all publicly-available sources and reflected such information in Allot's stock price. Under these circumstances, all purchasers of Allot's common stock during the Class Period suffered similar injury through their purchase of Allot's common stock at artificially inflated prices and a presumption of reliance applies.

**NO SAFE HARBOR**

42.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to

differ materially from those in the purportedly forward-looking statements.  Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, defendants are liable for those false forward-looking statements, because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Allot who knew that those statements were false when made.

### FIRST CLAIM
### Violation of Section 11 of
### The Securities Act Against All Defendants

43.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein only to the extent, however, that such allegations do not allege fraud, scienter or the intent of the defendants to defraud Plaintiff or members of the Class.  This count is predicated upon defendants' strict liability for making false and materially misleading statements in the Registration Statement.

44.    This claim is asserted by Plaintiff against all defendants by, and on behalf of, persons who acquired shares of the Company's stock pursuant to or traceable to the false Registration Statement issued in connection with the Company's November 2006 IPO.

45.    Individual Defendants as signatories of the Registration Statement, as directors and/or officers of Allot and controlling persons of the issuer, owed to the holders of the stock obtained through the Registration Statement the duty to make a reasonable and diligent investigation of the statements contained in the Registration Statement, at the time they became effective, to ensure that such statements were true and correct, and that there was no omission of material facts required to be stated in order to make the statements contained therein not

misleading.  Defendants knew, or in the exercise of reasonable care should have known, of the material misstatements and omissions contained in, or omitted from the Registration Statement, as set forth herein.  As such, defendants are liable to the Class.

46.     None of the defendants made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were true or that there was no omission of material facts necessary to make the statements made therein not misleading.

47.     Defendants issued and disseminated, caused to be issued and disseminated, and participated in the issuance and dissemination of, material misstatements to the investing public which were contained in the Registration Statement, which misrepresented or failed to disclose, *inter alia*, the facts set forth above.  By reason of the conduct herein alleged, each defendant violated and/or controlled a person who violated Section 11 of the Securities Act.

48.     As a direct and proximate result of defendants' acts and omissions in violation of the Securities Act, the market price of Allot's stock sold in the IPO was artificially inflated and Plaintiff and the Class suffered substantial damage in connection with their ownership of Allot's common stock pursuant to the Registration Statement.

49.     Allot is the issuer of the stock sold via the Registration Statement.  As issuer of the stock, the Company is strictly liable to Plaintiff and the Class for the material misstatements and omissions therein.

50.     At the times they obtained their shares of Allot, Plaintiff and members of the Class did so without knowledge of the facts concerning the misstatements or omissions alleged herein.

51.     This action is brought within one year after discovery of the untrue statements and

omissions, in and from the Registration Statement, which should have been made through the exercise of reasonable diligence, and within three years of the effective date of the Prospectus.

52.     By virtue of the foregoing, Plaintiff and the other members of the Class are entitled to damages under Section 11 as measured by the provisions of Section 11(e), from the defendants and each of them, jointly and severally.

### SECOND CLAIM
### Violation of Section 15 of
### The Securities Act Against the Individual Defendants

53.     Plaintiff repeats and realleges each and every allegation contained above, excluding all allegations above that contain facts necessary to prove any elements not required to state a Section 15 claim, including without limitation, scienter.

54.     This count is asserted against Individual Defendants and is based upon Section 15 of the Securities Act.

55.     Individual Defendants, by virtue of their offices, directorship and specific acts were, at the time of the wrongs alleged herein and as set forth herein, controlling persons of Allot within the meaning of Section 15 of the Securities Act.  The Individual Defendants had the power and influence, and exercised the same, to cause Allot to engage in the acts described herein.

56.     Individual Defendants' positions made them privy to and provided them with actual knowledge of the material facts concealed from Plaintiff and the Class.

57.     By virtue of the conduct alleged herein, the Individual Defendants are liable for the aforesaid wrongful conduct and are liable to Plaintiff and the Class for damages suffered.

**WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

(a)     Determining that this action is a proper class action under Rule 23 of the

Federal Rules of Civil Procedure;

(b)     Awarding compensatory damages in favor of Plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)     Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)     Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: May 15, 2007                    Respectfully submitted,

**BRODSKY & SMITH, LLC**

By:*Evan J. Smith, Esquire (ES3254)*
Evan J. Smith, Esquire (ES 3254)
240 Mineola Boulevard
Mineola, NY 11501
(516) 741-4977
(516) 741-0626 (fax)

**SCHIFFRIN BARROWAY**
**TOPAZ & KESSLER, LLP**
Richard A. Maniskas
D. Seamus Kaskela
280 King of Prussia Rd.
Radnor, PA 19087
(610) 667-7706
(610) 667-7056 (fax)

*Attorneys for Plaintiff*